412 Ill. 350 (1952)
106 N.E.2d 359
MICHIGAN BOULEVARD BUILDING COMPANY, Appellant,
v.
THE CHICAGO PARK DISTRICT, Appellee.
No. 32346.
Supreme Court of Illinois.
Opinion filed May 22, 1952.
*351 MacLEISH, SPRAY, PRICE & UNDERWOOD, of Chicago, (ROBERT S. CUSHMAN, and JOHN M. BETTS, of counsel,) for appellant.
PHILIP A. LOZOWICK, and KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, both of Chicago, (JOSEPH B. FLEMING, THOMAS M. THOMAS, and THOMAS F. SCULLY, of counsel,) for appellee.
JOHNSTON, THOMPSON, RAYMOND & MAYER, of Chicago, (FLOYD E. THOMPSON, ALBERT E. JENNER, JR., and WILLIAM B. DAVENPORT, of counsel,) for amicus curiae.
Decree affirmed.
Mr. JUSTICE MAXWELL delivered the opinion of the court:
Plaintiff, Michigan Boulevard Building Company, filed a complaint in the circuit court of Cook County seeking a declaratory judgment adjudging that an enabling act and two ordinances adopted pursuant thereto are unconstitutional *352 and void and praying for an injunction to restrain the defendant, Chicago Park District, from constructing an underground parking garage in Grant Park and Michigan Avenue and issuing revenue bonds pledging the revenues therefrom. Plaintiff appeals directly to this court from a decree dismissing the complaint for want of equity.
Plaintiff is the owner of a large office building at the southwest corner of Michigan Avenue and Washington Street in Chicago and has an unobstructed view of Grant Park and Lake Michigan from the Michigan Avenue side of its building. Defendant is a park district and has title to, and control over, certain parks and boulevards in the city of Chicago, including Grant Park.
The Chicago Park District Act was amended by an act approved June 21, 1951, herein referred to as "the enabling act," by which sections 25.1 to 25.9 were added. (Ill. Rev. Stat. 1951, chap. 105, pars. 333.23b to 333.23j.) By such amendment the Chicago Park District was authorized to acquire, erect and operate motor-vehicle parking lots, underground garages, parking meters and other revenue-producing facilities incidental to the parking of motor vehicles, and provision was therein made for the Park District to issue and sell bonds, payable solely and only from the revenues derived from the operation of its parking facilities, such bonds to be secured by a pledge of the revenues derived therefrom.
Pursuant to, and acting under, the authority of the enabling act, the Chicago Park District adopted an ordinance approving plans prepared by consulting engineers employed for that purpose for the construction of an underground parking garage in Grant Park and Michigan Avenue, and on the same date it adopted another ordinance authorizing the issuance and sale of $8,500,000 of revenue bonds to pay the cost of such construction.
Plaintiff contends that the enabling act does not authorize the construction of a parking garage on land owned *353 by the defendant and that if such a parking facility is constructed from the proceeds of the sale of revenue bonds the site must also be acquired from such proceeds. It is argued that the revenue from the proposed garage is not derived solely from the garage structure but is derived from the site also and that if the enabling act be construed to authorize the construction of facilities on an already-owned site the act violates section 12 of article IX of the constitution.
An examination of the enabling act fails to support plaintiff's position that it prohibits the construction of parking facilities on any property owned by the Park District. The power to acquire by purchase, gift, or otherwise own, control, erect, improve, extend, maintain and operate motor-vehicle parking facilities, as the commissioners may from time to time find necessity exists therefor, is provided by subparagraph (a) of section 25.1 of the enabling act. Subparagraph (e) of said section authorizes the borrowing of money and issuing bonds for the purpose of "acquiring, completing, erecting, constructing, equipping, improving, extending, maintaining or operating any or all of its parking facilities." The powers thus granted are quite general and are intended to cover any conceivable situation under which the commissioners might determine a necessity exists for a parking facility, including the borrowing of money for improving and extending an existing facility, whether or not the site of such facility be acquired through the proceeds derived from the issue of revenue bonds.
In support of its contention that, if the enabling act authorizes the construction of parking facilities upon existing property of the park district, it is pledging property other than that acquired through the proceeds derived from the sale of revenue bonds and therefore violates section 12 of article IX of the constitution, plaintiff cites City of Joliet v. Alexander, 194 Ill. 457, and Schnell v. City of Rock Island, 232 Ill. 89.
*354 In each of those cases the municipality executed a mortgage of property owned by the municipality, in addition to the property acquired by sale of the securities, as security for the payment of the obligation. Under such circumstances, it was held that default would result in the loss of property owned by the municipality not acquired through the sale of revenue securities and thus, the credit of the municipality was pledged for the payment of securities in violation of section 12 of article IX of the constitution.
The holding of the City of Joliet and Schnell cases has been modified. Where no property of a municipality is pledged to secure payment of an indebtedness, it does not violate the constitutional debt limitation to pledge the revenues both from the facility being extended and from the extension. (Ward v. City of Chicago, 342 Ill. 167; Maffit v. City of Decatur, 322 Ill. 82; Simpson v. City of Highwood, 372 Ill. 212; Poole v. City of Kankakee, 406 Ill. 521.) In the instant case, there is no attempt to pledge or mortgage any existing property, and the site, while valuable, is producing no revenue whatever. There is a distinct difference between the pledging of previously acquired physical property owned by a municipality and the pledging of revenues which may be partly derived therefrom.
It is next contended that the construction of the proposed parking garage is not a corporate purpose of the Park District. The act creating the park district provides that it has the right to acquire, construct, manage and exercise control over and supervise the operation of all parks, boulevards and driveways and to regulate traffic therein and thereon. Seven drives have been constructed in Grant Park which are used by the public in the enjoyment of the park and by those persons entering and leaving the loop area of the city of Chicago. It is stipulated that presently there is a demand for 5000 parking spaces, in addition to those now available, and that this deficiency in parking space will be 13,000 by the year 1955. Lack of parking space *355 congests and blocks traffic in the park's boulevards and seriously interferes with their use as boulevards and as a means of access to the park and its recreational facilities.
What constitutes a corporate purpose as applied to any municipal corporation depends somewhat upon existing factual conditions. A definition of corporate purpose cannot be static. Changing conditions require that application of the limitations of that legal principle be tempered with due recognition of the existing situation so the purpose for which the public body was organized may be accomplished and enjoyment thereof by the public made possible.
We have recognized the right of cities, under proper statutory authorization, to regulate traffic and the use of streets, to install parking meters adjacent to city streets and provide for off-street parking. (City of Bloomington v. Wirrick, 381 Ill. 347; Poole v. City of Kankakee, 406 Ill. 521). The boundaries of the Chicago Park District are coterminus with the boundaries of the city of Chicago, so that in a limited sense it has the same traffic problems in that large metropolitan area. There is no substantial difference between the authority of cities and that of the Park District in regard to the regulation of traffic. The construction of off-street parking, including an underground parking garage, is, in our opinion, within the corporate purposes of the Park District.
Plaintiff denies the authority of the park commissioners to pass the ordinances in question and infers that, to comply with section 9 of article IX of the constitution, the enabling act should have been submitted to the voters at a referendum. The corporate authorities of the Chicago Park District are the commissioners, who are appointed by the mayor of the city of Chicago. The act creating the Chicago Park District was submitted to and approved by the voters and provided that the commissioners exercise control over, and supervise the operation of, all parks, boulevards, ways and other public properties, exercise full powers *356 to manage and control all parks, driveways, boulevards and parkways committed to its care and to establish by ordinances all needful rules and regulations for the government and protection of parks, boulevards and driveways.
Despite the broad grant of power to the commissioners, plaintiff maintains that the construction of the proposed parking facilities is a fundamental change in the powers of the Park District and beyond the field of activities contemplated by the act creating it. This issue is practically identical with the question of corporate purpose previously discussed. Since the proposed construction has been found to be a proper corporate purpose, it follows that the commissioners, as corporate authorities, have the right to pass the necessary enabling ordinances.
Plaintiff charges that, since the enabling act applies only to the Chicago Park District, it is a special law and in violation of section 22 of article IV of the constitution. The subject of parks is not among those enumerated in section 22 of article IV concerning which no local or special laws can be passed. (Comrs. of Lincoln Park v. Fahrney, 250 Ill. 256, Kocsis v. Chicago Park Dist. 362 Ill. 24.) The only possible constitutional prohibition contained in section 22, other than upon the subjects enumerated, is contained in the last paragraph which reads, "In all other cases where a general law can be made applicable, no special law shall be enacted." From the facts stipulated in this case we are of the opinion that the legislature was within its authority in determining, by the passage of the enabling act, that a general law would not suffice.
This case also involves the much-litigated question of the uses to which Grant Park may be put. Plaintiff asserts that the construction of the proposed underground parking garage will violate the dedication of such park, which was to be kept free of buildings; and is inconsistent with, and will be a violation of, the easement created in favor of the abutting landowners. In passing upon these contentions *357 it is necessary to examine the facts involving the dedication and the proposed construction.
No evidence was offered before the trial court other than a very extensive stipulation of facts. Included in such stipulation was the provision that either party may refer to, and the court consider, any facts relative to Grant Park and that portion of Michigan Avenue involved herein contained in what are known as the Ward cases (City of Chicago v. Ward, 169 Ill. 392; Bliss v. Ward, 198 Ill. 104; Ward v. Field Museum, 241 Ill. 496, and South Park Comrs. v. Ward & Co. 248 Ill. 299.) Those cases very ably cover the history of Grant Park and the restrictions and easements with which we are here concerned. The opinion in the case of Ward v. Field Museum, 241 Ill. 496, particularly went into great factual detail and correlated all of the historical background recited in the two previous Ward cases. In view of the recital of historical facts in the Ward opinions, we deem it necessary to give only a brief summary.
Grant Park is bounded on the north by the south line of Randolph Street extended, on the east by the harbor line of Lake Michigan, on the south by Eleventh Place extended and on the west by the east line of Michigan Avenue. That part of Grant Park which lies north of the center line extended of Madison Street is located in Fort Dearborn Addition to Chicago and that part south of such center line is located in Fractional Section 15 Addition to Chicago. On the Fort Dearborn Addition plat all land lying east of Michigan Avenue was left unsubdivided and written thereon were the words, "Public ground  forever to remain vacant of buildings." The acknowledgment of the plat contained the following: "The public ground between Randolph and Madison streets, and fronting upon Lake Michigan, is not to be occupied with buildings of any description." The Canal Commissioners laid out and platted said Fractional Section 15 Addition and all the land east *358 of the west line of Michigan Avenue was left unsubdivided, and no east line was indicated for Michigan Avenue but it was subsequently established as 90 feet east of the west line. The Canal Commissioners sold the lots in the addition by reference to a map in their office on which the vacant space was marked "Open ground  No buildings." It is conceded by the parties that the lots facing on Michigan Avenue were sold at an enhanced price by reason of the restriction and their unobstructed view of Lake Michigan.
The plans provide for a two-level reinforced concrete underground parking garage which will occupy the subsurface of a considerable portion of Grant Park and adjacent subsurface of Michigan Avenue to a line 33 feet east of the west line thereof from the south line of Randolph Street to the north line of Monroe Street. Such plans also provide a further widening of Michigan Avenue by taking a strip off of the west side of Grant Park between said streets from seven to fourteen feet in width. The entrance and exits will be located in Michigan Avenue as thus widened.
No part of the building proper will be located above ground and it is proposed that after construction has been completed the surface of Grant Park will be restored and attractively landscaped. During the construction, Grant Park north of Monroe Street and west of the Illinois Central railroad's right of way will be unusable by the public for approximately eighteen months. Vents and air intakes for the proposed parking facilities will project approximately five feet above the surface of the park and it is stipulated by the parties that such vents and air intakes are in and of themselves structures, not buildings. It was stipulated the Chicago Park District intends to and is able to conceal the vents and air intakes with shrubbery so that they will not disfigure Grant Park, that the vents and air intakes will not obstruct the view across Grant Park. It was further stipulated that the total area of Grant Park is *359 303.7 acres and the portion proposed to be taken in connection with the parking facilities including the widening of Michigan Avenue and the construction of vents and air intakes is .37 of one acre.
There is disagreement between the parties as to whether Grant Park is a dedicated park in the sense that the tracts now making up the park were set apart and restricted by the original dedicators to a particular purpose, rather than set apart as a common-law dedication for public use with certain restrictions. Plaintiff relies heavily upon the case of Village of Riverside v. MacLain, 210 Ill. 308, to support its contention that the tracts were set off for park purposes. An examination of the facts in that case discloses that the original dedicator prepared maps showing certain areas as parks, colored the park portions in green, recorded plats, placed the recorded plats in its offices and offered and sold lots with reference to such maps and plats. The court, after referring to the foregoing facts and commenting upon the admission of the governing municipalities of such dedications for park purposes in subsequent litigation, properly held that a complete common-law dedication as a public park had been consummated.
The facts in the instant case are entirely different. Here, it is stipulated that defendant is the owner in fee of Grant Park, that title was derived from the State of Illinois and the city of Chicago, that the tracts making up Grant Park had been dedicated by the then owners prior to its acquisition by the city of Chicago, that the terms of the dedication appeared upon the plats and certificates and that such terms consisted only of the restrictions hereinabove referred to. It was not until 1844, several years after the original common-law dedication by the original dedicators who had dedicated it as "public" "open ground," "vacant of buildings," that the city of Chicago by resolution accepted the area and in such resolution declared that it be enclosed as a public park.
*360 Plaintiff also cites Village of Princeville v. Auten, 77 Ill. 325. There, a square tract of land was left in the middle of the village by the proprietors without designating its purpose. The court came to the conclusion that, in the absence of any proof as to the purpose for which it was left vacant, resort must be had to declarations and acts of the donors, and held it was a more reasonable conclusion that it was dedicated with a view to park purposes than as a site for public buildings for the use of the municipal officers.
In both the Riverside and Princeville cases the court found, as a matter of fact, that the original dedication was for park purposes and, hence, they fell under the more restrictive rules applicable to parks found to be dedicated as such by the original proprietors. We have consistently held that it is improper to divert an existing originally dedicated park from the park purpose for which it was dedicated. (City of Jacksonville v. Jacksonville Railway Co. 67 Ill. 540; Village of Princeville v. Auten, 77 Ill. 325; Village of Riverside v. MacLain, 210 Ill. 308; Melin v. Community Consolidated School District, 312 Ill. 376.) In the absence of any affirmative proof in the record, we are of the opinion that we are not justified in holding that the original dedication in the case at bar was for "park" purposes rather than for other "public" purposes.
The remaining question on this particular issue is whether the construction of the proposed facilities is a violation of the original dedication of Fort Dearborn Addition and Fractional Section 15 Addition, wherein land now included in Grant Park is to remain vacant of buildings. It is beyond the power of the legislature to change the legal result of the act of dedication. Grant Park may not be diverted to any use which would be in contravention of the original dedication. It therefore becomes necessary to examine closely the meaning of the restrictions contained in the original dedication of the two tracts now making *361 up Grant Park. It is apparent that the intention was to keep the public tracts free of buildings so that there would be unobstructed view of Lake Michigan. Furthermore, the intention undoubtedly was to make the lots abutting on such tracts more desirable and easements were created in favor of the abutting land owners. It is not reasonable to assume that the original proprietors could have visualized the necessity for underground parking facilities or the desirability of constructing any structure under ground. We cannot conceive that the proprietors of the additions intended that the restrictions and the easements arising therefrom should extend to the center of the earth. That it was the intent and purpose of the dedicators and the legal effect of the dedications to restrict the surface of the tracts, so as to prohibit the erection of buildings thereon for whatever purpose, has been finally determined in the Ward cases. City of Chicago v. Ward, 169 Ill. 392; Bliss v. Ward, 198 Ill. 104; Ward v. Field Museum, 241 Ill. 496; South Park Comrs. v. Ward & Co. 248 Ill. 299.
The question of the propriety of the construction of any building under ground in Grant Park has never before been raised, although this court has conceived of such a possibility. In Ward v. Field Museum, 241 Ill. 496, we said: "There was testimony that certain structures are absolutely necessary for the comfort of the public and the proper use of the park, but most of them, such as shelters in case of storms, band stands, lavatories and the like, can be provided without the erection of what would properly be characterized as a building. There is no necessity for locating power houses, stables or things of that kind above the surface of the ground." After a review of all the facts and the previous decisions of the court, we are of the opinion that, as to that portion of the garage proposed to be built below the surface of the park, the construction will not violate the restrictions of the dedications. This applies to the abutting owners as well as the public, since *362 the easements arose out of the restrictions and, if the restrictions are not violated, neither would there be a violation of the easements.
It is true that the plans for the proposed parking garage show that several vents and air intakes will project five feet above the surface and that such structures are not buildings within the generally accepted meaning of that term. While it is stipulated that the vents and intakes are structures and not buildings, it is drawing too fine a line of distinction to say that the erection of structures generally would not be in violation of the spirit of the restrictions in the original dedications. The parking facilities would be useless without means of ingress and egress and ventilation. The amount of the surface to be used for the widening of Michigan Avenue and occupied by the five-feet-high vents and intakes, which would be necessary in order to use the underground parking facilities, is an infinitesimal portion constituting approximately one tenth of one per cent of the whole park. We believe this is a proper situation for the application of the maxim de minimus non curat lex.
It is conceded by the parties that the Chicago Park District will restore and attractively landscape the park, and conceal the vents and intakes with shrubbery so that they will not disfigure Grant Park. It is further stipulated by the parties that such vents and intakes will not obstruct the view of any tenant of the plaintiff or any tenant of other abutting property. While the type of easement created by the restrictions is not exactly defined, it has been described by an abutter himself in the case of McCormick v. Chicago Yacht Club, 331 Ill. 514, as "light, air, passage and view over the land eastward from their premises to the waters of Lake Michigan." The character of the easement is plainly an easement for view in addition to light and air. While the easements in favor of the abutting land owners cannot be diminished, they should not, on the other *363 hand, be enlarged. Since there is no contention by plaintiff that its right to view, light and air will be interfered with, and we could not agree if such a contention were raised, then it cannot complain if the area is used for some proper corporate purpose not in violation of the easement.
There is precedent in this country for the construction of underground parking garages in public parks. It was held in Lowell v. City of Boston, 322 Mass. 709, 79 N.E.2d 713, that the use for a parking garage of a portion of the subsurface of the Boston Commons, dedicated as a park, without materially altering the appearance or use of the surface thereof, was entirely consistent with its dedicated purpose. Similarly, the Supreme Court of California, in the case of City and County of San Francisco v. Linares, 16 Cal.2d 441, 106 Pac.2d 369, held that neither the temporary suspension of surface use during construction nor the permanent use of the small portion of the surface for entrances and exits would justify the court in denying the relief sought. Both of the foregoing cases were cited by defendant in defense of its position that the construction of the proposed facilities is consistent with the original dedication, which would, of course, mean consistent with the restrictions. They are cumulatively important in shedding light upon whether the construction of an underground garage constitutes a proper corporate purpose and proper use of a park and, hence, will be briefly discussed herein, but have little bearing upon the question of the violation of the original restrictions.
In the Linares case the court found that the original dedication was as a public square or public reserve. It was later dedicated as a park by municipal authority. In the Lowell case it was held that Boston Commons had been originally dedicated as a training field and cow pasture, with the exception of a parcel acquired through the Parkman gift, and later set aside for park purposes. In both cases, as here, the land was originally reserved for use of *364 the public and later converted by statutory or municipal authority to public parks.
Lastly, plaintiff questions defendant's authority to construct underground parking facilities beneath the surface of Michigan Avenue. It has been stipulated between the parties and agreed that the Park District is the owner in fee of that part of Michigan Avenue proposed to be used for the construction of the underground parking garage and entrance and exits, being that portion of Michigan Avenue lying east of a line 33 feet east of the west line of Michigan Avenue.
The substance of the argument is based upon the fact that the Park District has no right to construct any facility in the subsurface of Michigan Avenue which will permanently prevent the use of that subsurface for any other proper purpose, and that the use of the subsurface for a parking garage constitutes a diversion of the street from its dedicated purpose.
Where the fee is in the city or other municipal owner it is not an unlawful diversion of the use of a street to permit a vault or other similar underground structure to be erected beneath the street, when such structure does not interfere with the purpose for which the street was dedicated. (Tacoma Safety Deposit Co. v. City of Chicago, 247 Ill. 192.) In the case of Cleveland v. City of Detroit, 37 N.W.2d 625, the Michigan courts decided contrary to plaintiff's position. In Barsaloux v. City of Chicago, 245 Ill. 598, we held that the city of Chicago might properly use the subsurface of its streets for subway purposes. The proposed use is not an unlawful diversion of the use of Michigan Avenue from its dedicated purpose and is a lawful use of the subsurface in order to properly regulate and control traffic upon the surface of its streets.
The decree of the trial court, dismissing the complaint, is affirmed.
Decree affirmed.