ANNECCA, INC., d/b/a U.S. Electric Company, Plaintiff-Appellee, v. THE METROPOLITAN FAIR AND EXPOSITION AUTHORITY, Defendant-Appellant (Hyre Electric Company, Plaintiff-Appellee and Cross-Appellant).

First District (5th Division)   No. 84—1768

Opinion filed December 28, 1984.—Rehearing denied February 4, 1985.

Reuben & Proctor, of Chicago (Don A. Reuben, Jaroslawa Z. Johnson, and Steven A. Weiss, of counsel), for appellant.

Adam Bourgeois, Ltd., of Chicago (Adam Bourgeois and Wilma M. Scharrer, of counsel), for appellee Annecca, Inc.

Seyfarth, Shaw, Fairweather & Geraldson, of Chicago (Thomas G. Dent and Christopher A. Hansen, of counsel), for appellee Hyre Electric Company.

PRESIDING JUSTICE MEJDA delivered the opinion of the court:

Plaintiff Annecca, Inc., doing business as U.S. Electric Company (Annecca), brought this action to enjoin the Metropolitan Fair and Exposition Authority (the Authority) from performing in-house electrical services for trade shows and expositions in place of an outside contractor at McCormick Place and Donnelly Hall in Chicago. Plaintiff Hyre Electric Company (Hyre) also brought suit against the Authority alleging that it should be awarded the electrical contract pursuant to competitive bidding procedures. The two cases were initially consolidated and later severed in part, but by order of court remained consolidated for Hyre's participation in the preliminary injunction proceeding in the Annecca action which is the subject of this appeal. The circuit court held that the Authority's performance of the in-house electrical services would be *ultra vires* acts outside the scope of the Authority's powers and preliminarily enjoined it from removing Annecca as the interim electrical contractor.

The Authority appeals from the *ultra vires* holding and the issuance of the preliminary injunction. Hyre's cross-appeal also seeks dissolution of the preliminary injunction. The issues presented for review are: (1) whether the Authority's performance of in-house electrical services for trade shows and expositions is *ultra vires*, and (2) whether the preliminary injunction was properly entered.

Annecca and the Authority have submitted an agreed statement of facts in lieu of a record on appeal pursuant to Supreme Court Rule 311 (87 Ill. 2d R. 311). The pertinent facts are set forth as follows. Defendant Authority is a municipal corporation operating pursuant to statutory authority. (Ill. Rev. Stat. 1983, ch. 85, par. 1221 *et seq.*) The Authority operates McCormick Place and Donnelly Hall in Chicago to accommodate public and private expositions. These facilities are used by the Authority for such activities as trade shows, theatrical performances, meetings and a wide variety of other events which require temporary installation of electrical machinery, lighting fixtures,

switches, receptacles and controls. All such equipment must be removed after each event.

When the Authority presents a show, it enters into a contract with a show manager for the rental of space. The show manager sometimes hires the independent contractors to perform specific services. Such electrical work is billed to the exhibitors at an hourly rate. Prior to 1981, the trade show related electrical work was performed by Fischbach & Moore Electrical Contracting, Inc. Since January 1, 1981, the trade show related electrical work has been performed by Annecca, pursuant to a letter dated December 15, 1980. Annecca currently charges the Authority $25.82 an hour for journeyman work, $27.21 an hour for foreman work, and $29.96 an hour for superintendent work. These rates vary if overtime is necessary. The Authority, in turn, charges the exhibitors $40 an hour for the electrical work.

On November 21, 1983, the Authority placed advertisements for bids for the electrical services at McCormick Place and Donnelly Hall. Bids were only solicited for the trade show and exposition work, not for general electrical maintenance. Eight bids were received by the Authority and turned over to its accountants for financial analysis. Annecca's bid was $24.09 an hour for journeyman work, $25.09 an hour for foreman work, $26.09 an hour for general foreman work, and $29.34 for superintendent work.

At its January 13, 1984, board meeting, the Authority rejected all eight bids and directed a re-examination of the feasibility of performing the electrical work in-house. Joseph Hannon, managing director of the Authority, requested Hugo Alumni, the Authority's comptroller, to analyze the savings which the Authority could generate by performing the electrical services in-house.

Subsequently, the Authority reached an agreement with the union involved as to the Authority's performing the electrical work in-house and sent a letter to Annecca terminating its work as of June 15, 1984. Hyre filed suit on May 3, and Annecca filed suit on May 11, each alleging that the performance of electrical service in-house was *ultra vires* and each claiming it should be awarded the contract as the lowest bidder pursuant to the advertisement for bids. The two suits were initially consolidated and then severed, but the Hyre suit was then consolidated "for the purpose of allowing Plaintiff, Hyre Electric Company, a right to participate in the hearing for preliminary injunction." Hyre has never moved for preliminary injunction relief.

Annecca's performance of the electrical work is supervised by Michael Annecca, president of U.S. Electric. He employs a superintendent and a general foreman, as well as 21 additional electricians to

perform the work for the Authority. Each of these 23 electricians is currently employed by the Authority for maintenance work when they are not doing electrical work for plaintiff Annecca.

Twenty of the 23 electricians employed by Annecca worked for Fischbach & Moore prior to performing the same services for Annecca. The Authority's letter of December 18, 1980, directs Annecca to utilize these electricians at McCormick Place. The Authority has now agreed that if it is permitted to perform the electrical work in-house, it will use the same 23 electricians currently performing the work for Annecca. In addition to the part-time electricians, the Authority employs 12 full-time electricians for electrical maintenance at McCormick Place.

Plumbing work for the trade shows is performed by employees of the Authority and billed to exhibitors at an hourly rate. In addition, security, janitorial services, coat check services and telephone rental services are all provided by employees of the Authority.

On June 14, 1984, Annecca filed a motion for preliminary injunction. Pending hearing thereon, the court on June 26, 1984, enjoined the Authority from removing Annecca as the electrical contractor. Oral argument thereafter was had on the threshold question of whether performance of electrical services by the Authority was within its statutory powers. Hyre participated in the argument although not a party to the motion. An order was entered July 18, 1984, finding that the performance of electrical services for setting up and taking down trade shows and expositions at McCormick Place and Donnelly Hall is outside the scope of the corporate powers of the Authority. The court denied the Authority's motion for judgment on the pleadings as to the power to perform the electrical services and ordered that the injunctions entered June 26, 1984, and extended on July 12, 1984, preventing removal of Annecca, remain in force until further order of court, provided that this order be vacated if Annecca does not join in seeking an immediate expedited appeal should the Authority seek an interlocutory appeal. Annecca was further ordered to post an injunction bond aggregating $75,000 to cover any losses suffered by the Authority by reason of Annecca's continued performance. The Authority filed an interlocutory appeal, and Hyre filed a cross-appeal. An expedited appeal was granted.

OPINION

The Authority contends on appeal that the performance of electrical services in-house for trade shows and expositions is not an *ultra vires* act. This contention necessarily involves consideration of the

provisions of the Metropolitan Fair and Exposition Authority Act (the Act) (Ill. Rev. Stat. 1983, ch. 85, par. 1221 *et seq.*) as to the rights and powers of the Authority.

Section 4 of the Act empowers the Authority:

> "To promote, operate and maintain fairs, expositions and conventions from time to time in the metropolitan area and in connection therewith to arrange, finance and maintain industrial, cultural, educational, trade and scientific exhibits and to construct, equip and maintain auditoriums and exposition buildings for such purposes. The Authority is granted all rights and powers necessary to perform such duties." (Ill. Rev. Stat. 1983, ch. 85, par. 1224.)

Section 5 of the Act outlines the rights and powers of the Authority which expressly include these rights and powers:

> "(b) To accept the assignment of, assume and execute any contracts heretofore entered into by Chicago Park Fair.
>
> (c) To acquire, own, construct, lease, operate and maintain fair and exposition grounds and facilities, and to fix and collect just, reasonable and nondiscriminatory charges for the use of such facilities. The charges so collected shall be made available to defray the reasonable expenses of the Authority and to pay the principal of and the interest upon any revenue bonds issued by the Authority.
>
> (d) To enter into contracts treating in any manner with the objects and purposes of this Act." (Ill. Rev. Stat. 1983, ch. 85, par. 1225.)

Section 24 of the Act states, "All construction contracts and contracts for supplies, materials, equipment and services, when the expense thereof will exceed $2,500, shall be let to the lowest responsible bidder \*\*\*," and further specifies several exceptions to the competitive bidding requirement. (Ill. Rev. Stat. 1983, ch. 85, par. 1244.) Section 25 of the Act (Ill. Rev. Stat. 1983, ch. 85, par. 1245) explains how bids should be solicited and opened.

However, beyond the express powers of municipal corporations, courts have held that implied powers exist which are extensions of the granted powers. *Strub v. Village of Deerfield* (1960), 19 Ill. 2d 401, 167 N.E.2d 178; *Charlton v. Champaign Park District* (1982), 110 Ill. App. 3d 554, 442 N.E.2d 915; *Redemske v. Village of Romeoville* (1980), 85 Ill. App. 3d 286, 406 N.E.2d 602. See also *Illinois Power Co. v. City of Jacksonville* (1960), 18 Ill. 2d 618, 165 N.E.2d 300.

In a factual situation strikingly similar to the instant case, the Illinois Supreme Court found that implied powers enabled a park district

to construct a parking garage. In *Michigan Boulevard Building Co. v. Chicago Park District* (1952), 412 Ill. 350, 106 N.E.2d 359, the owner of an office building sought an injunction to restrain defendant park district from constructing an underground parking garage in Chicago's Grant Park. Plaintiff there appealed to the Illinois Supreme Court the dismissal of his complaint, asserting, *inter alia*, that the park district's enabling legislation did not authorize the construction of a parking garage on land owned by the park district. In affirming the trial court, the supreme court found that the construction of off-street parking was within the corporate purposes of the park district in light of statutory authority to construct, manage, exercise control over and supervise operation of all parks and regulate traffic therein. Since there was an anticipated need of 13,000 more parking spaces in the loop area by 1955, the court stated that conditions required a pragmatic interpretation of the statutory grant of authority. The court made this finding after recognizing that the parking spaces would be used as much by persons entering and leaving the loop area as by persons enjoying the park and its facilities. The court stated:

> "A definition of corporate purpose cannot be static. Changing conditions require that application of the limitations of that legal principle be tempered with due recognition of the existing situation so the purpose for which the public body was organized may be accomplished and enjoyment thereof by the public made possible." *Michigan Boulevard Building Co. v. Chicago Park District* (1952), 412 Ill. 350, 355, 106 N.E.2d 359, 363.

Another analogous situation was presented in *Charlton v. Champaign Park District* (1982), 110 Ill. App. 3d 554, 442 N.E.2d 915, which addressed the propriety of a park district's authority to enter into a concession with a private firm to operate a waterslide in a public park. Plaintiff taxpayers there asserted the park district did not have the statutory power to enter into the contract and was required to advertise for bids before entering into the contract. Although the Park District Code (Ill. Rev. Stat. 1979, ch. 105, par. 1—1 *et seq.*) contained no express language allowing such concessions, the trial court relied on the implications of several express statutory grants of authority which allowed the park district to establish and maintain various recreational programs. The appellate court affirmed and held that the power of the park district to enter into the agreement was necessarily implied from the Park District Code.

In *Indiana State Fair Board v. Hockey Corp. of America* (Ind. 1982), 429 N.E.2d 1121, the Indiana Supreme Court held that the direct operation of a skating rink by the State Fair Board was not an

*ultra vires* act and was within the board's statutory authority. The court reasoned that the legislature gave broad powers to the board to conduct activities which benefit the Indiana State Fairgrounds and thereby directly benefit agriculture. The court noted that sporting events such as motorcycle races were regularly held on the fairgrounds, and even though these events were not directly related to agriculture, they generated proceeds which were deposited in the accounts of the State Fair Board.

Plaintiffs in the instant case attempt to distinguish these cases by arguing that the scope of power delegated to a municipal corporation should not be enlarged by liberal construction. Plaintiffs cite *People ex rel. Sweitzer v. City of Chicago* (1936), 363 Ill. 409, 2 N.E.2d 330, for the proposition that doubts concerning the existence of a statutory power are to be resolved against the corporation and the power denied. They also assert that the two park district cases and the skating rink case are factually inapposite to the case at bar and involved enabling legislation different from the Metropolitan Fair and Exposition Act.

■ Plaintiffs correctly note that the cases cited by the defendant involve different factual situations and different enabling legislation; nonetheless, the principles these cases enunciate are persuasive. As the Illinois Supreme Court stated in *Michigan Boulevard Building Co. v. Chicago Park District* (1952), 412 Ill. 350, 106 N.E.2d 359, the purpose for which the public body was organized and the public benefit are of primary importance in defining corporate purpose. These two factors must be considered when evaluating the impact of changing conditions on the legal doctrine of corporate purposes. Accordingly, *Michigan Boulevard* requires that the limitations of the Metropolitan Fair and Exposition Act be defined in a realistic manner which accomplishes the purpose for which the Authority was created and the benefit to the public provided by the Authority's activities.

The application of the foregoing principles in the instant case is indicated because the express grant of power to the Authority in the Act is itself quite broad. The Authority is allowed to "promote, operate and maintain fairs, expositions and conventions \*\*\* and in connection therewith to arrange, finance and maintain \*\*\* exhibits and to construct, equip and maintain auditoriums and exposition buildings for such purposes." (Ill. Rev. Stat. 1983, ch. 85, par. 1224.) The Act grants the Authority "all rights and powers necessary to perform such duties" (Ill. Rev. Stat. 1983, ch. 85, par. 1224), and expressly states that the Authority's rights and powers include the right to operate and maintain exposition facilities and to fix and collect charges

for the use of such facilities. Ill. Rev. Stat. 1983, ch. 85, par. 1225.

It is undisputed in the instant case that the electrical services are essential to the corporate purpose outlined by the statute: promoting, operating and maintaining fairs and expositions. Since electricity is necessary to such events, authority for the actions at issue is quite plain under the statute, especially pursuant to the provision that the Authority may "equip and maintain" exposition halls (Ill. Rev. Stat. 1983, ch. 85, par. 1224), and fix and collect charges for the use of such facilities. Ill. Rev. Stat. 1983, ch. 85, par. 1225.

The agreed facts submitted herein show the Authority provides plumbing work for the trade shows and expositions at McCormick Place with its own employees which is billed to exhibitors in the same manner as electrical work, "i.e., an hourly rate"; and that security, janitorial services, coat check services and telephone rental services are all provided by employees of the Authority. The authority contends that it would perform the instant electrical services, as it already performs the plumbing and other services, all of which, it reasons, are within its statutory authority to "operate and maintain" trade shows and expositions. (Ill. Rev. Stat. 1983, ch. 85, par. 1224.) Plaintiffs respond that this is a "bootstrap argument" and that the Authority's performance of plumbing services in-house for exhibitors is also an *ultra vires* act, citing the following statutory provision pertaining to plumbers, which states:

> "No municipal corporation or political subdivision shall engage in plumbing unless such plumbing is performed by one or more licensed plumbers, or licensed apprentice plumbers under supervision in accordance with this Act, provided that any such governmental unit may contract for plumbing with any person authorized to engage in plumbing in this State." (Ill. Rev. Stat. 1983, ch. 111, par. 1105.)

Plaintiffs argue therefrom that since the Authority itself is not a licensed plumbing contractor, it cannot perform such plumbing services. Since the issue as to plumbing is not before us for decision, we need not address it other than as a purported analogy herein. However, there is no indication in this record that the Authority's plumbing services are not provided by licensed plumbers or that there is any other violation of the foregoing statutory provisions by defendant's conduct. Plaintiffs' argument is therefore neither analogous nor persuasive. Nonetheless, the foregoing does suggest that if the legislature intends to limit a municipal corporation's power to conduct an incidental activity, it may readily do so by express language.

■ In the case at bar, plaintiffs contend the Authority's proposed

action is *ultra vires* and prohibited by section 11—33—1 of the Illinois Municipal Code, pertaining to municipal registration of electrical contractors, which states:

"The corporate authorities of each municipality may require the registration of electrical contractors, and may impose an annual registration fee of $25 on each registered contractor. An electrical contractor who is registered in one municipality, however, shall not be required by any other municipality to be registered or to pay a registration fee in the other municipality.

The term 'electrical contractor,' as used in this section, means any person engaged in the business of installing or altering by contract electrical equipment for the utilization of electricity for light, heat, or power. But the term 'electrical contractor' shall not include the installing or altering of (1) radio apparatus or equipment for wireless reception of sounds and signals, or (2) apparatus, conductors, or other equipment installed for or by public utilities, including common carriers, which are under the jurisdiction of the Illinois Commerce Commission, for use in their operation as public utilities. Nor shall the term include the employees employed by an electrical contractor to do or supervise his work." (Ill. Rev. Stat. 1983, ch. 24, par. 11—33—1.)

Plaintiffs argue that because the Authority would employ and supervise electricians, it would be an "electrical contractor" within the definition of this statute and would be an attempt to enter "the commercial business of electrical contracting." Plaintiffs' reading of this statute is overly broad.

The Authority's involvement with the electrical services herein is only incidental to its duty to "promote, operate and maintain fairs, expositions and conventions from time to time *** and *in connection therewith* to arrange, finance and maintain industrial, cultural, educational, trade and scientific exhibits and to *construct, equip and maintain auditoriums and exposition buildings for such purposes.*" (Emphasis added.) (Ill. Rev. Stat. 1983, ch. 85, par. 1224.) The phrase "in connection therewith" indicates that the legislature intended to grant the Authority the broad powers necessary to arrange trade shows and "equip and maintain" auditoriums such as McCormick Place and Donnelly Hall for the above-set-out purposes. Ill. Rev. Stat. 1983, ch. 85, par. 1224.

It is to be noted that the Authority is itself a municipal corporation for public purposes with governmental powers. (*People ex rel. Coutrakon v. Lohr* (1956), 9 Ill. 2d 539, 547, 138 N.E.2d 471.) A con-

struction of the statutory provision for licensing of electrical contractors to bar the proposed in-house electrical work would dramatically undercut the Authority's ability to achieve a clearly expressed statutory duty. The employment of the same electricians heretofore employed by electrical contractors at McCormick Place and Donnelly Hall for such electrical work as may be incidentally required to equip and maintain the trade shows will not constitute making the Authority an electrical contactor, engaged in the *business* of installing or altering electrical equipment, as defined in section 11—33—1 of the Illinois Municipal Code. Instead, the authority will be employing electricians for this limited and incidental purpose, and not to compete commercially as an electrical contractor nor to perform electrical services outside the scope of its own statutory purposes.

Finally, we point out that, contrary to plaintiffs' contentions, nothing in the competitive bidding statute suggests that the Authority may not perform its own electrical work. (Ill. Rev. Stat. 1983, ch. 85, pars. 1244, 1245.) The statute states that all construction contracts and contracts for supplies, materials, equipment and services, over $2,500, require competitive bidding. (Ill. Rev. Stat. 1983, ch. 85, par. 1244.) The statute does not address whether an outside contractor must be employed, but merely outlines the procedure to be followed if a contract is to be awarded. (*Inskip v. Board of Trustees* (1962), 26 Ill. 2d 501, 187 N.E.2d 201; accord, *Montana Chapter, National Electrical Contractors Association v. State Board of Education* (1960), 137 Mont. 382, 352 P.2d 258.) Therefore, the competitive bidding statute cannot be read as a limitation on the Authority's power to accomplish its corporate purpose.

We conclude that the Authority's conduct in performing the in-house electrical services with its own electricians is not *ultra vires* and that the trial court therefore erred in preliminarily enjoining the Authority from removing Annecca as its electrical contractor. In light of this conclusion, we need not address the arguments raised by Hyre in its cross-appeal that the preliminary injunction was inappropriate as a matter of law.

For the foregoing reasons, the order of the circuit court is reversed and the preliminary injunction dissolved.

Reversed. Injunction dissolved.

PINCHAM and LINN, JJ., concur.