**CITY OF DURANGO; Board of County Commissioners of the County of La Plata; and Durango Transit Advisory Board, Petitioners,**

v.

**DURANGO TRANSPORTATION, INC., Respondent.**

No. 89SC487.

Supreme Court of Colorado, En Banc.

March 25, 1991.

Smith & West, David P. Smith, Durango, for petitioners.

Law Office of Nancy P. Bigbee, Nancy P. Bigbee, Denver, for respondent.

Geoffrey Wilson, Denver, for amicus curiae Colorado Mun. League.

Marion A. Brewer, Denver, for amicus curiae Colorado Counties, Inc.

Gorsuch, Kirgis, Campbell, Walker and Grover, Gerald E. Dahl, Denver, for amicus curiae Roaring Fork Transit Agency.

John R. Kennedy, Rolf G. Asphaug, Denver, for amicus curiae Regional Transp. Dist.

Justice LOHR delivered the Opinion of the Court.

We granted certiorari to review a judgment of the Colorado Court of Appeals holding that counties are not exempt from the jurisdiction of the Public Utilities Commission when operating mass transportation systems within county boundaries. *See Durango Transp., Inc. v. City of Durango*, 786 P.2d 428 (Colo.App.1989). We reverse and remand with directions.

I.

This case arose out of the efforts of the City of Durango (City) to obtain the authority to operate a mass transit service between Durango and the La Plata County Airport, and between Durango and the Purgatory Ski Area. The City is located in La Plata County.

Durango Transportation, Inc. (DTI), a private corporation, holds a certificate of public convenience and necessity issued by the Public Utilities Commission (PUC). The certificate allows DTI to provide mass transit service within La Plata County, including the routes sought by the City. In 1983 DTI agreed to sell a portion of its PUC certificate authority for operation of mass transportation in La Plata County to the City. Specifically, the City agreed to purchase certification for the routes between Durango and the La Plata County Airport, and between Durango and the Purgatory Ski Area. The contract, dated August 9, 1983, also granted the City a three-year option to acquire the balance of DTI's permit authority for La Plata County. In a letter dated September 14, 1984, the City sought to exercise that option. DTI responded by a letter from its attorney dated October 31, 1984, refusing to sell its PUC authority for the additional routes.[1] On November 8, 1984, the City notified DTI that it considered the October 31 letter to be an "unequivocal repudiation" of the August 1983 contract and that consequently the City Council had voted to rescind the agreement.

The City then sought an alternative means of obtaining authorization for the transportation service. On November 21, 1984, the City and the County entered an intergovernmental agreement (IGA) to provide mass transit in La Plata County. As modified on August 29, 1985, the IGA provided for operation and maintenance of the mass transit system by the City. The City is to establish fares with advice and recommendation by the Transit Advisory Board, made up of both City and County appointees.

DTI filed a complaint with the PUC against the City and the county for operating a mass transit service without PUC authority. On September 20, 1985, the PUC dismissed the complaint against the County and that portion against the City pertaining to operation of the service within city boundaries, for lack of jurisdiction. The PUC denied the motion to dismiss the complaint against the City for operation of the service outside the city boundaries.[2] On December 13, 1985, DTI filed suit against the City, the County and the Durango Transit Advisory Board in the District Court of La Plata County. It is this suit that resulted in the judgment of the court of appeals now before us on review.

1. DTI gave as its reason for declining sale pursuant to the option that the City had not paid consideration for the option and that, in the opinion of DTI, the City had no expectation of actually providing service on the other routes. Under the contract, DTI was to receive compensation based in part on revenue generated by the City for providing service on the additional routes in the event the City exercised the purchase option.

2. On August 11, 1986, subsequent to the filing of this case in district court, the PUC hearing examiner ordered that the hearing on the matter be vacated pending action by the district court. On June 15, 1987, the PUC dismissed the proceeding when DTI failed to provide a status report of the action before the district court.

In the district court action, DTI sought an injunction against the City, the County, and the Durango Transit Advisory Board to prevent operation of the mass transit service in La Plata County outside the city limits of Durango without authorization by the PUC. DTI also sought damages from all the defendants for infringement of rights held by DTI under its certificate of public convenience and necessity. Finally, DTI sought damages from the City for alleged breach of the August 1983 contract between the City and DTI whereby the City agreed to purchase DTI's PUC authority to operate certain routes in La Plata County. The City counterclaimed against DTI for restitution of payments made on the contract prior to the alleged repudiation and anticipatory breach of the contract by DTI.

After a bench trial, the district court dismissed the complaint filed by DTI, finding that the City and County had statutory authority to enter the IGA and that operation of the service is not subject to PUC jurisdiction.[3] The court of appeals reversed the trial court's judgment dismissing DTI's complaint and remanded for further findings on whether DTI should be granted an injunction and damages. The court of appeals concluded that operation of a mass transportation system by a county is subject to PUC jurisdiction. Thus, the court of appeals held that operation of mass transit by the City and the County within the county but outside the city limits pursuant to a joint agreement is subject to PUC jurisdiction.

██ We granted certiorari to review the holding of the court of appeals that operation of a mass transportation system by a county within its boundaries is subject to PUC jurisdiction. We reverse and remand

for further proceedings consistent with this opinion.[4]

## II.

The Colorado Constitution prohibits the General Assembly from "delegat[ing] to any special commission ... any power to make, supervise or interfere with any municipal improvement, money, property or effects ... or perform any municipal function whatever." Colo. Const. art. V, § 35. We have long recognized that the State Board of Public Utilities formed to regulate public utilities (now the Public Utilities Commission) is a special commission for the purposes of article V, section 35. *Town of Holyoke v. Smith,* 75 Colo. 286, 294, 226 P. 158, 161 (1924); *accord Board of County Comm'rs of Arapahoe v. Denver Bd. of Water Comm'rs,* 718 P.2d 235, 244 (Colo. 1986); *Loveland v. PUC,* 195 Colo. 298, 301, 580 P.2d 381, 383 (1978); *City of Lamar v. Town of Wiley,* 80 Colo. 18, 21, 248 P. 1009, 1010 (1926); *People ex rel. Utilities Comm'n v. Loveland,* 76 Colo. 188, 190, 230 P. 399, 400 (1924). We held, therefore, that article V, section 35, prohibits PUC regulation of public utilities owned and operated by a city within the boundaries of that city. *Holyoke,* 75 Colo. at 298, 226 P. at 162; *accord Board of County Comm'rs,* 718 P.2d at 244; *Loveland,* 195 Colo. at 301, 580 P.2d at 383; *Lamar,* 80 Colo. at 21, 248 P. at 1010; *Utilities Comm'n,* 76 Colo. at 190, 230 P. at 400.

In 1954 the Colorado Constitution was amended by adoption of article XXV, which provides:

In addition to the powers now vested in the General Assembly of the State of Colorado, all power to regulate the facilities, service and rates and charges therefor, including facilities and service and

---

**3.** The court held for the City on its counterclaim for anticipatory repudiation of the DTI contract but allowed no damages because it concluded that the amounts paid by the City under the contract were fully offset by the value of services received from DTI under the contract. The court of appeals affirmed the determination that the City was entitled to rescind the contract based on DTI's anticipatory repudiation. The anticipatory repudiation issues are not before us for review.

**4.** DTI asked that we rule on the validity of the IGA and on the jurisdiction of the PUC over operation of mass transportation in La Plata County by the City pursuant to that agreement. We decline to do so. The court of appeals did not address the validity of the IGA, and for this court to do so would be premature.

rates and charges therefor within home rule cities and home rule towns, of every corporation, individual, or association of individuals, wheresoever situate or operating within the State of Colorado, whether within or without a home rule city or home rule town, as a public utility, as presently or as may hereafter be defined as a public utility by the laws of the State of Colorado, is hereby vested in such agency of the State of Colorado as the General Assembly shall by law designate.

Until such time as the General Assembly may otherwise designate, said authority shall be vested in the Public Utilities Commission of the State of Colorado; provided however, nothing herein shall affect the power of municipalities to exercise reasonable police and licensing powers, nor their power to grant franchises; and provided, further, that nothing herein shall be construed to apply to municipally owned utilities.

Colo. Const. art. XXV. We have held that the purpose of article XXV "was to grant to the General Assembly the authority to regulate privately owned public utilities *within* home rule cities," authority previously reserved to home rule cities as a "local matter." *Denver v. PUC,* 181 Colo. 38, 43–44, 507 P.2d 871, 873 (1973) (emphasis in original); *accord Union Rural Electric Ass'n, Inc. v. Town of Frederick,* 670 P.2d 4, 7 (Colo.1983); *Craig v. PUC,* 656 P.2d 1313, 1316 (Colo.1983).

In the present case, the court of appeals held that article XXV grants broad authority to the PUC including jurisdiction to regulate a public utility owned and operated by a county. *Durango Transp., Inc.,* 786 P.2d at 431–32. The City, County and amici assert that the County is exempt from regulation by the PUC under both article V, section 35, and article XXV. To resolve this issue we must determine, first, whether a county falls within the exemption from regulation expressed in article V, section 35, and interpreted in *Holyoke,* and second, whether the addition of article XXV to the Colorado Constitution altered the scope of PUC regulatory authority with respect to a county.

## A.

In determining the application of article V, section 35, to a county we look first to the language of the provision itself. *Colorado State Civil Service Employees Ass'n v. Love,* 167 Colo. 436, 445, 448 P.2d 624, 628 (1968). "Where the language of the Constitution is plain and its meaning clear, that language must be declared and enforced as written." *Colorado Ass'n of Public Employees v. Lamm,* 677 P.2d 1350, 1353 (Colo.1984); *accord People ex rel. Park Reservoir Co. v. Hinderlider,* 98 Colo. 505, 507, 57 P.2d 894, 895 (1936).

■ Article V, section 35, prohibits PUC regulation of "any *municipal* improvement, money, property or effects" and PUC performance of "any *municipal* function." (Emphasis added.) The Colorado Constitution does not define "municipal."

The Maryland Court of Appeals has noted that in modern usage the term "municipal" includes any department of government of the state "created by the Legislature with political powers to be exercised for the public welfare." *Neuenschwander v. Washington Suburban Sanitary Comm'n,* 187 Md.App. 67, 48 A.2d 593, 597 (1946); *see also Sides v. Cabarrus Memorial Hospital, Inc.,* 22 N.C.App. 117, 205 S.E.2d 784, 787 (1974) (Holding that, as contrasted with a city or county, a hospital is not a municipal corporation. "A municipal corporation must have a public purpose and be invested with a governmental function."). The Maryland court traced the history of the term, stating that

[t]he word "municipal" is derived from "municipium," a city having the right of Roman citizenship, governed by its own laws in respect to local affairs but united to the republic by ties of sovereignty and general interest. Likewise in the early law of England, the term was applied to self-governing cities and towns. In later years, however, its application has extended to include the internal government of the State. So, a municipal corporation is now defined as a department of the government of the State, created by

the Legislature with political powers to be exercised for the public welfare. *Neuenschwander*, 48 A.2d at 597.

As early as 1875, the United States Supreme Court stated that "[c]ounties, cities, and towns are municipal corporations, created by the authority of the legislature." *Commissioners of Laramie County v. Commissioners of Albany County*, 92 U.S. 307, 308, 23 L.Ed. 552 (1875) (holding that a county has no greater right than a city to be free from territorial changes imposed by the state legislature). The court further stated that "[p]ublic duties are required of counties as well as of towns, as a part of the machinery of the State; and, in order that they may be able to perform those duties, they are vested with certain corporate powers." *Id.* at 311.

Courts in other states have noted that the term "municipal" may be construed in a narrow sense to mean only cities, towns and villages, or in a broad sense to mean any political subdivision of the state with a public purpose and a governmental function. *See Louisville v. Babb*, 75 F.2d 162, 166 (7th Cir.1935) (adopting the "broader meaning" of "municipal" of "public or governmental purpose as distinguished from private," in construing constitutional authorization for property tax exemption), *cert. denied, Babb v. Louisville*, 295 U.S. 738, 55 S.Ct. 650, 79 L.Ed. 1686 (1935); *St. Louis Housing Auth. v. City of St. Louis*, 361 Mo. 1170, 239 S.W.2d 289, 294 (1951) ("[m]unicipality now has a broader meaning than 'city' or 'town,' and presently includes bodies public or essentially governmental in character and function."); *Laret Inv. Co. v. Dickmann*, 345 Mo. 449, 134 S.W.2d 65, 68 (1939) (" 'In its strict and primary sense the term 'municipal corporation' applies only to incorporated cities, towns, and villages, ... [b]ut in the larger and ordinarily accepted sense the term is applied to any public local corporation, exercising some function of government, and hence includes counties.' " (quoting *State ex rel. Caldwell v. Little River Drainage Dist.*, 291 Mo. 72, 236 S.W. 15, 16 (1921))). Adopting this broader meaning, courts in other states have interpreted the term "municipal" to include counties, *People v.*

*Walker*, 59 Ill.App.3d 192, 16 Ill.Dec. 736, 739–40, 375 N.E.2d 843, 847–48 (1978); a sanitation and improvement district, *Rexroad, Inc. v. Sanitary & Improvement Dist. No. 66*, 222 Neb. 618, 386 N.W.2d 433, 436 (1986); a fair and exposition authority, *Annecca, Inc. v. Metropolitan Fair & Exposition Auth.*, 129 Ill.App.3d 1030, 85 Ill. Dec. 173, 179, 473 N.E.2d 541, 547 (1984), *cert. denied;* and a housing authority, *St. Louis Housing Auth. v. City of St. Louis*, 361 Mo. 1170, 239 S.W.2d 289, 294 (1951), *Laret Inv. Co. v. Dickmann*, 345 Mo. 449, 134 S.W.2d 65, 68 (1939). In addition, Congress has defined "municipality" to mean "political subdivision or public agency or instrumentality of a State" for the purpose of federal bankruptcy law. 11 U.S.C. § 101(34) (1988).

The inclusion of counties in the term "municipal" recognizes the increasing role of counties in providing local services considered to be "municipal functions." *See Walker*, 16 Ill.Dec. at 739, 375 N.E.2d at 847 ("Even though counties were once regarded as mere political subdivisions of the State possessing few corporate functions, ... [citations omitted] counties have since entered into corporate functions of all kinds."); Reynolds, *Local Government Law* § 6 (1982) (the distinction between cities, which provide local services, and counties, which act as administrative arms of state government, has become blurred as counties have begun to provide more local services). Thus, in modern usage the scope of the term "municipal" is to be determined by reference to the particular function to be performed rather than by strict adherence to the classification of the governmental entity performing that function as a city, county, or other unit of government.

Colorado law has given county government an increasing role in providing local services. In 1973, the general assembly authorized counties to "develop, maintain, and operate mass transportation systems." Ch. 131, sec. 1, § 36–1–1(g), 1973 Colo.Sess. Laws 466, 466 (codified as amended at § 30–11–101(1)(f), 12A C.R.S. (1990

Supp.)).[5] One author noted the increasing role of counties in providing mass transit and stated that

> [u]ntil the late 1950's transit systems in the United States were generally profitable, and many were privately owned and operated. But decline in patronage and increasing costs of labor and equipment reversed the profitable trend by the 1960's, and system after system was taken over by some public agency. Since the need for transportation is usually regional in scope, many transit systems are being operated by such general-function units as the county.

Reynolds, *Local Government Law* § 183 (1982).

■ In determining a particular definition for a term capable of more than one meaning, we seek to further the intent underlying the statutory or constitutional provision in question by considering "the object to be accomplished and the mischiefs to be avoided." *The Inst. for the Educ. of the Mute and Blind v. Henderson*, 18 Colo. 98, 104, 31 P. 714, 716 (1892); *accord, People ex rel. Y.D.M.*, 197 Colo. 403, 407, 593 P.2d 1356, 1359 (1979); *Holyoke*, 75 Colo. at 288, 226 P. at 158. *See* § 2–4–203(1)(a), (e), 1B C.R.S. (1983) (in construing an ambiguous statute a court may consider the object sought to be attained and the consequence of a particular construction). The functional approach to defining "municipal" is particularly compelling in light of our interpretation of article V, section 35. We observed in *Holyoke* that article V, section 35, protects the historical right to local self-government. *Holyoke*, 75 Colo. at 288–91, 226 P. at 159–60. We noted that "[t]he *subjects* to which this protection extends [e.g., improvements and property] ... are such as properly fall within the domain of local self-government." *Holyoke*, 75 Colo. at 293, 226 P. at 160 (emphasis added). The basis for defer-

ence to local control over local services was articulated in *Holyoke*. We stated that

> '[t]he justification for regulating charges in some particular business would usually be that it constitutes a de jure or a de facto monopoly or enjoys special privileges.' [quoting *Freund on Police Power*, § 378]
>
> A plant owned and operated by consumers can never become a monopoly, nor can it be an instrument of oppression....
>
> On principle it would seem entirely unnecessary to give a commission authority to regulate the rates of a municipally owned utility. The only parties to be affected by the rates are the municipality and its citizens, and, since the municipal government is chosen by the people, they need no protection by an outside body. If the rates for electric light or power are not satisfactory to a majority of the citizens, they can easily effect a change, either at a regular election, or by the exercise of the right to recall.

*Holyoke*, 75 Colo. at 296, 226 P. at 161. Under this rationale we held that utilities provided by a municipality *outside* of municipal boundaries, where customers do not have recourse through the political process, *are* subject to PUC regulation. *Lamar*, 80 Colo. at 22–23, 248 P. at 1011.

Under Colorado law, "[t]he powers of a county as a body politic and corporate shall be exercised by a board of county commissioners therefor." § 30–11–103, 12A C.R.S. (1986). Commissioners are elected from districts "by the voters of the whole county." § 30–10–306(1), 12A C.R.S. (1986). In addition, "[e]very elective county officer of the state of Colorado may be recalled from office at any time by the registered electors of the county." § 30–10–201, 12A C.R.S. (1986). Thus, county residents have the power to effect

---

5. § 30–11–101(1)(f), as amended in 1990, states in pertinent part:

> (1) Each organized county within the state shall be a body corporate and politic, and as such shall be empowered for the following purposes:
> ....

> (f) To develop, maintain, and operate mass transportation systems.... Counties ... shall have the authority: To fix, maintain, and revise passenger fees, rates, and charges, and terms and conditions for such systems; to prescribe the method of development, maintenance, and operation of such mass transportation systems.

change in the governing board responsible for the quality of service provided by a county owned mass transit system operating within county boundaries. The need for oversight by the PUC is no more apparent for counties than for cities. We hold, therefore, that the term "municipal" in article V, section 35, applies to counties when engaged in providing mass transit within county boundaries.[6] As a result, counties are exempt from PUC regulation in providing such service unless this result has been changed by the adoption of article XXV.

### B.

■ In 1954 the Colorado Constitution was amended by adoption of article XXV, which specifically addresses the powers of the PUC. Article XXV vests "all power to regulate" public utilities in the PUC unless and until the general assembly designates another agency to perform that function. In addition, article XXV expressly extended PUC authority to private utilities operating "within home rule cities and home rule towns."[7] In doing so, article XXV expressly states that "nothing herein shall be construed to apply to municipally owned utilities." We therefore must determine whether this broad recognition of power and narrow exemption altered the scope of PUC regulatory authority with respect to counties. In approaching this task we note that "[i]t is an established axiom of constitutional law that where there are both general and specific constitutional provisions relating to the same subject, the specific provision will control." *de'Sha v. Reed,* 194 Colo. 367, 370, 572 P.2d 821, 823 (1977); *accord People ex rel. Boatright v. Newlon,* 77 Colo. 516, 521, 238 P. 44, 46 (1925); *People v. Field,* 66 Colo. 367, 373, 181 P. 526, 528 (1919). Nevertheless, "[i]f separate clauses in the same constitutional ... enactment can by one construction be harmonized so as to produce no inconsistencies ... courts should adopt that construction." *Cooper Motors, Inc. v. Board of County Comm'rs of Jackson County,* 131 Colo. 78, 83, 279 P.2d 685, 688 (1955).

Article XXV expressly extends PUC authority to include regulation of private utilities operating in home rule cities. Colo. Const. art. XXV; *accord Frederick,* 670 P.2d at 7; *Denver,* 181 Colo. at 46, 507 P.2d at 874. We have interpreted the final clause in article XXV that "nothing herein shall be construed to apply to municipally owned utilities," to provide a specific limitation on the extension of PUC authority to utilities within home rule cities. *Frederick,* 670 P.2d at 7 ("The final clause in paragraph two of Article XXV [that 'nothing herein shall be construed to apply to municipally owned utilities'] has been interpreted to restrict the powers conferred on the PUC in the first paragraph [to regulate public utilities within home rule cities]."); *Denver,* 181 Colo. at 45, 507 P.2d at 875 ("The last clause merely says in effect that although the power to regulate *public utilities* within home rule cities is transferred to the [PUC],[8] there is *no* intention to give

---

6. The similarities between cities and counties when engaged in providing local services that militate in favor of self-regulation do not detract from the established principle that cities and counties are fundamentally different where basic government structure is concerned. *Compare* Title 31, 12B C.R.S. (1986 & 1990 Supp.) (Colorado municipal code, which defines "municipality" as "a city or town." § 31–1–101(6)) *with* Title 30 12A C.R.S. (1986 & 1990 Supp.) (addressing structure and governance of counties, including boundaries, powers and functions). A county acting to provide local services commonly considered to be "municipal functions" is acting in a capacity distinct from its function as an administrative arm of state government. It is for the purpose of providing local services alone that we hold that a county falls within the meaning of "municipal" in article V, section 35.

7. Prior to adoption of article XXV, home rule cities, under article XX of the Colorado Constitution, had exclusive power to regulate privately owned public utilities operating within the borders of such cities and local in use and extent. *Frederick,* 670 P.2d at 7; *Denver,* 181 Colo. at 43–45, 507 P.2d at 874.

8. The quoted portion of the opinion states that the power is "transferred to the General Assembly." The remainder of the opinion discusses the transfer of power to the PUC. Article XXV in effect vests the power to regulate public utilities in the PUC unless and until the general assembly designates some other agency to perform this function.

the [PUC] authority to regulate a *municipally* owned utility *within* the corporate limits of the municipality.").

We have not previously considered the specific exemption in article XXV in the context of regulation of counties. DTI argues that the exemption applies only to limit the grant of PUC authority to regulate public utilities operating in cities or towns, and therefore the broad recognition of power in article XXV provides for PUC regulation of counties. Nothing in the plain language of the exemption suggests that it should be read so narrowly. Moreover, we need not rely on the article XXV exemption alone in concluding that a county is exempt from PUC regulatory authority when operating within its boundaries. With the exception of the extension of authority to regulation of private utilities operating in home rule cities, there is no suggestion in article XXV or in our cases construing it that this constitutional provision granted the PUC any regulatory authority not possessed by the general assembly prior to 1954.[9] *Miller Bros., Inc. v. PUC*, 185 Colo. 414, 431; 525 P.2d 443, 451 (1974); *accord Mountain States Tel. & Tel. Co. v. PUC*, 763 P.2d 1020, 1025 (Colo. 1988). In the context of city owned utilities, we have long considered the prohibition of regulation of municipal utilities operating within municipal boundaries expressed in article V, section 35, to provide a limitation on transfer of authority possessed by the general assembly to the PUC by article XXV. *See, e.g., Board of County Comm'rs*, 718 P.2d at 244 ("Our past decisions and the provisions in article V, section 35, and article XXV of the Colorado Constitution preclude only PUC, or other, regulation of municipally owned utility service *within* municipal boundaries." (emphasis added)); *Thornton v. PUC*, 157 Colo.

188, 193–95, 402 P.2d 194, 197 (1965) (Both article V, section 35, and article XXV exempt municipally owned utilities from regulation). Citing both article V, section 35, and article XXV we stated that "[a]t no time have we wavered from the principle that the Colorado Constitution specifically circumscribes jurisdiction of the PUC." *Frederick*, 670 P.2d at 8 (We held, therefore, that the PUC lacks jurisdiction over a municipally owned utility operating within the municipal boundaries of the town of Frederick.).

In part IIA of this opinion we held that the term "municipal" in article V, section 35, applies to counties when engaged in providing mass transit within county boundaries, and that therefore the article V, section 35, municipal exemption from PUC regulation applies to such county activities. We see no reason to conclude that article XXV extends PUC authority simply because the municipality is a county. The rationale articulated in *Holyoke* for the exemption of municipally owned utilities from PUC regulation, "that when a municipally owned utility operates within the municipality, there is no one who needs the protections of the PUC," is equally applicable to the exemption for municipally owned utilities under article XXV. *K.C. Electric Assoc., Inc. v. PUC*, 191 Colo. 96, 100, 550 P.2d 871, 873 (1976); *see Loveland v. PUC*, 195 Colo. 298, 303, 580 P.2d 381, 385 (1978) (holding that services provided by municipalities *outside* of municipal boundaries are still subject to PUC regulation). Thus, the adoption of article XXV did not change the principle established by our cases construing article V, section 35, that "municipalities" are exempt from regulations by a "special commission" when providing municipal utility services within the boundaries of that municipality.[10] We hold,.

---

**9.** The analysis of the 1954 Ballot Proposals by the Legislative Council recognized that, for practical purposes, the only effect of article XXV was to extend PUC regulation to utilities operating in home rule cities because the general assembly itself had already vested regulatory power in the PUC. Research Pub. No. 5 (1954) Legislative Council of the Colo. General Assembly, Amendment No. 1, p. 1.

**10.** Nothing in this opinion should be read to alter the power of the general assembly to delegate authority for self-regulation to an entity such as the Regional Transportation District. Such power is expressly preserved in article XXV, which states that *"[u]ntil such time as the General Assembly may otherwise designate,* said authority [to regulate public utilities] shall be vested in the Public Utilities Commission." Colo. Const. art. XXV (emphasis added).

therefore, that under article V, section 35, and article XXV of the Colorado Constitution, a county is exempt from regulation by the PUC when providing mass transit within county boundaries.

### III.

We reverse the holding of the court of appeals and remand for further proceedings consistent with this opinion.