**REGIONAL TRANSPORTATION DISTRICT, a political subdivision of the State of Colorado, Plaintiff–Appellee,**

v.

**The COLORADO DEPARTMENT OF LABOR AND EMPLOYMENT, DIVISION OF LABOR, David D. Mitchem, in his official capacity as Director of the Division of Labor, and the Amalgamated Transit Union Local 1001, Defendants–Appellants.**

No. 91SA393.

Supreme Court of Colorado,
En Banc.

May 26, 1992.

Eiberger, Stacy, Smith & Martin, Raymond W. Martin, Rodney L. Smith and Roy A. Adkins, Denver, for plaintiff-appellee.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., and John D. Baird, Asst. Atty. Gen., Denver, for defendants-appellants Colorado Dept. of Labor and Employment, Div. of Labor, and David M. Mitchem, in his official capacity as Director of the Div. of Labor.

Donald P. MacDonald and Lynne L. Hicks, Denver, for defendant-appellant Amalgamated Transit Union Local 1001.

Justice ERICKSON delivered the Opinion of the Court.

This appeal is from an order issued by the Director of the Colorado Department of Labor and Employment, Division of Labor, (Director) under sections 8–3–112(2), 3B C.R.S. (1986), and 8–3–113(3), 3B C.R.S. (1986), directing Regional Transportation District (RTD) to submit unresolved collective bargaining issues to binding arbitration. RTD contends that the provisions of sections 8–3–112(2) and 8–3–113(3) that require binding arbitration of unresolved collective bargaining issues constitute an unconstitutional delegation of legislative authority. Consequently, RTD refused to submit to arbitration and appealed the Director's order. The district court reversed the Director's order and granted summary judgment for RTD. The Division of Labor (Division), the Director, and the Amalgamated Transit Union Local 1001 (ATU) appealed. We hold that, consistent with the nondelegation provisions of both article V, section 35, and article XXI, section 4, of the Colorado Constitution, RTD can be required by legislation to submit to binding interest arbitration to resolve a labor dispute with its employees' representative, the ATU. Accordingly, we reverse the summary judgment and remand to the district court for further proceedings consistent with this opinion.

I

The facts are not disputed. The Labor Peace Act regulates the conduct of the

parties to a labor dispute. §§ 8–3–101 to – 123, 3B C.R.S. (1986 & 1991 Supp.); *City of Golden v. Ford*, 141 Colo. 472, 348 P.2d 951 (1960). Sections 8–3–112 and 8–3–113 govern mediation and arbitration between an authority, such as RTD,[1] and its employees.

ATU is a collective bargaining unit that represents the employees of RTD. On December 4, 1990, ATU, pursuant to section 8–3–113(3),[2] filed a notice of intent to strike after the expiration of its labor agreement with RTD on February 28, 1991. At the request of the Director, RTD and ATU engaged in negotiations and mediation from February 1991 to June 1991. When the parties failed to resolve their dispute, the Director held a hearing to determine whether to allow the strike. On August 20, 1991, the Director held that a strike would interfere with the preservation of the public peace, health, and safety, denied ATU's request to strike, and ordered ATU and RTD to submit their dispute to an arbitrator in accordance with section 8–3–112(2).[3] RTD appealed the order to the district court and sought injunctive relief. In the interim, arbitration was held[4] and, on October 14, 1991, the arbitrator issued an award within the parameters of each party's last bargaining offer. RTD refused to implement the award.

On appeal of the Director's order to arbitrate, the district court granted summary judgment in favor of RTD, concluding that RTD has standing to challenge the constitutionality of sections 8–3–112(2) and 8–3–113(3)[5] and that the interest arbitration provisions are unconstitutional. The dis-

---

1. RTD, as a "district ... which operates a mass transportation system," is an authority for purposes of the Labor Peace Act. *See* § 8–3–104(2), (15); *Hoff v. Amalgamated Transit Union, Division 662*, 758 P.2d 674 (Colo.App.1987).

2. Section 8–3–113(3) states:

    Where the exercise of the right to strike is desired by the employees of any authority, the employees or their representatives shall file with the division written notice of intent to strike not less than forty calendar days prior to the date contemplated for such strike. Within twenty days of the filing of the notice, the director shall enter an order allowing or denying the strike based on the grounds of whether or not such strike would interfere with the preservation of the public peace, health, and safety in accordance with rules and regulations of the division. Any order denying a strike under this section shall include an order to arbitrate in accordance with section 8–3–112. Such arbitration shall be entered into not later than one hundred days from the filing of the notice to strike. Immediately upon receipt of a notice of intent to strike, the director shall take steps to effect mediation, if possible. In the event of failure to mediate, the director shall endeavor to induce the parties to arbitrate the controversy. Any strike before the expiration of forty days from the giving of notice of intent to strike or in violation of an order of the director, unless such order is changed on appeal or otherwise, shall constitute an unfair labor practice.

3. Section 8–3–112(2) provides:

    All parties to any labor dispute when the employer is an authority shall submit to arbitration upon written order of the director when such written order is the result of the procedure set forth in section 8–3–113(3).

    Any order so given shall be subject to appeal within five days of the receipt of such order by either the employee's representative or the authority, who are parties in interest.... The results of any arbitration conducted in accordance with the procedure set forth in this article shall be binding upon all parties in interest with the right of appeal to any court of competent jurisdiction on the grounds that the director or arbitration board has been unfair, capricious, or unjust in its conduct, determinations, or award.

4. The trial court denied RTD's motion for a temporary restraining order from arbitration because it concluded there had been no demonstration of irreparable injury.

5. ATU maintained at the trial level that RTD did not have standing to challenge the constitutionality of either the statutes under which it is organized or statutes directing the performance of its duties. The trial court ruled that section 8–3–112(2), which provides for appeal of an order of the Director by the employee's representative or the authority in a labor dispute, expressly authorizes RTD to raise such a challenge. The trial court acknowledged that a political subdivision generally may not challenge the constitutionality of its own enabling legislation, *see Denver Urban Renewal Authority v. Byrne*, 618 P.2d 1374, 1379 (Colo.1980); *In re District 50 Metro. Recreational Dist. v. Furbush*, 441 P.2d 645, 646 (Colo.1968), but noted that RTD was established under the Regional Transportation District Act, §§ 32–9–101 to –164, 13 C.R.S. (1973 & 1991 Supp.), not under the sections at issue here. ATU states in its brief that it does not raise the standing issue on appeal because of the need to resolve the constitutional questions.

trict court determined that RTD is a quasi-municipal corporation and performs municipal functions. Therefore, it found that the General Assembly's provision for binding arbitration upon the order of the Director constitutes "[t]he delegation of decision-making authority to a nongovernmental arbitrator so that that individual can determine the terms and conditions of public employment" and is "an unlawful delegation of legislative authority." The district court also found that there was insufficient governmental oversight to safeguard the arbitrator's acts and cited *Greeley Police Union v. City Council,* 191 Colo. 419, 553 P.2d 790 (1976), *City & County of Denver v. Denver Firefighters Local No. 858,* 663 P.2d 1032 (Colo.1983), and *City of Aurora v. Aurora Firefighters' Protective Association,* 193 Colo. 437, 566 P.2d 1356 (1977), for the proposition that "Colorado courts have consistently held that binding interest arbitration is an unconstitutional delegation of legislative authority."

On October 31, 1991, the district court certified its order as a final judgment, which permitted an immediate appeal pursuant to C.R.C.P. 54(b), and stayed RTD's remaining claims pending our resolution of the constitutional issue. ATU and the Division appealed to this court.

## II

RTD contends and the district court found that the provisions of sections 8-3-112(2) and 8-3-113(3) that authorize the Director to order arbitration constitute an unconstitutional delegation of legislative responsibilities.

A statute is presumed to be constitutional and will be upheld unless the party attacking the statute proves that the statute is unconstitutional beyond a reasonable doubt. *E.g., Renteria v. Colorado State Dept. of Personnel,* 811 P.2d 797, 799 (Colo.1991); *Colorado Ass'n of Pub. Employees v. Board of Regents,* 804 P.2d 138, 142 (Colo.1990). A statute should be construed, if possible, to be constitutional. *See, e.g., Colorado Ass'n of Pub. Employees,* 804 P.2d 138; *Colorado Springs Fire Fighters Ass'n, Local 5 v. City of Colorado Springs,* 784 P.2d 766 (Colo.1989); *People v. Schwartz,* 678 P.2d 1000 (Colo.1984) (courts have duty to interpret statutes to uphold their constitutionality). If the statutes in issue may be reasonably given a constitutional interpretation, we must do so.

This case was concluded with the entry of summary judgment in favor of RTD. Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." C.R.C.P. 56(c); *see, e.g., Churchey v. Adolph Coors Co.,* 759 P.2d 1336 (Colo. 1988); *United States v. Jesse,* 744 P.2d 491 (Colo.1987). Thus, even if the underlying historical facts are undisputed, summary judgment must be denied if application of the law to the facts lends itself to different inferences that create an issue of fact. *Mt. Emmons Mining Co. v. Town of Crested Butte,* 690 P.2d 231 (Colo.1984).

## A

■ RTD asserts that the provisions in sections 8-3-112(2) and 8-3-113(3) that require it to engage in arbitration upon the order of the Director violate article V, section 35, because RTD is a municipality or, alternatively, because setting the terms and conditions of employment for its employees is a municipal function. We disagree.

Article V, section 35, of the Colorado Constitution provides:

> The general assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever.

In determining whether article V, section 35 applies to RTD, we must first look to the language contained in the constitution. *City of Durango v. Durango Transp., Inc.,* 807 P.2d 1152, 1155 (Colo.1991); *Colorado State Civil Serv. Employees Ass'n v. Love,* 167 Colo. 436, 445, 448 P.2d 624, 628

(1968). "Where the language of the Constitution is plain and its meaning clear, that language must be declared and enforced as written." *Colorado Ass'n of Pub. Employees v. Lamm*, 677 P.2d 1350, 1353 (Colo.1984). Summary judgment was proper only if RTD is a municipality or the setting of terms of an employment contract to which RTD is a party constitutes a municipal function.

■■■ The term "municipal" as used in article V, section 35, of the Colorado Constitution is not limited to cities and towns. *See Durango*, 807 P.2d 1152 (acknowledging that the Colorado Constitution does not define the term "municipal"). In *Durango* we stated that the purpose of article V, section 35, is to protect the right to local self-government over local services. *Id.* at 1157 (citing *Town of Holyoke v. Smith*, 75 Colo. 286, 226 P. 158 (1924)). We adopted a "functional" approach for determining whether a unit of government is a municipality and a particular service is a municipal service within the meaning of article V, section 35. In holding that the term "municipal" applies to counties when engaged in providing mass transit entirely within county boundaries, we noted that the "county residents have the power to effect change in the governing board responsible for the quality of service provided by a county owned mass transit system operating within county boundaries." *Durango*, 807 P.2d at 1157–58. Similarly in *Holyoke*, we held that article V, section 35, prohibits Public Utility Commission regulation of rates charged by a municipally owned utility providing electric service to customers within the boundaries of the municipality. *Holyoke*, 75 Colo. at 298, 226 P. at 162. Because the only parties affected by the utility rates were "the municipality and its citizens, and, since the municipal government is chosen by the people, they need no protection by an outside body." *Id.* at 296, 226 P. at 161. The affected citizens were fully able to remedy any perceived problems in the setting of utility rates through the regular election process or exercise of the right of recall. *Id.* When a city supplies utility services outside its municipal boundaries, however, consumers have no such recourse through the political process, and regulation by the Public Utilities Commission is constitutionally permissible. *City of Lamar v. Town of Wiley*, 80 Colo. 18, 23, 248 P. 1009, 1010–11 (1926). Under the functional approach to nondelegation issues, therefore, we examine whether the function in question is truly local in the sense that, principally if not exclusively, it affects only those persons residing within the boundaries of the governmental unit in question and whether the political processes make those who perform the function responsive to the electorate within the affected area.

The attributes of local government that *Durango* and *Holyoke* sought to protect in declaring that no violation of article V, section 35, had occurred are not present here. The function at issue is the negotiation of a labor agreement that will set the terms and conditions of employment for RTD employees. The structure of RTD makes the officials responsible for labor negotiations fully answerable to the electorate within district boundaries. In this respect the case resembles *Durango* and *Holyoke*. However, RTD is not a multiple purpose governmental entity, such as a city or a county, providing general local government services. It was created pursuant to special enabling legislation that applies exclusively to RTD. Regional Transportation District Act, §§ 32–9–101 to –161, 13 C.R.S. (1973 & 1991 Supp.). The enabling legislation for RTD was directed toward providing a coordinated approach and solution to a single problem—mass transportation for an area encompassing all or several parts of cities and counties in the hub of Colorado's center of commerce.[6] Because the Denver–Metropolitan area is the state's business and cultural center, activities that may impact the efficient operation of this area involve economic and social issues of concern to

6. The services RTD provides extend to Denver, Boulder, and Jefferson counties, and parts of Adams, Arapahoe, and Douglas counties, including some unincorporated areas. § 32–9–106, 13 C.R.S. (1991 Supp.).

the entire state as well as to the citizens within the boundaries of the area served by RTD. This fact is evidenced by the special legislation by which RTD has come into being. In this respect, the RTD mass transit system and the employment relations between RTD and the workers who enable the transit system to operate are subjects that transcend the concerns of persons residing within RTD boundaries. *See* § 32–9–102(1)(a), 13 C.R.S. (1973). The fact that the functioning of RTD is a matter of statewide concern is also evidenced by the source of the arbitration requirement contained in sections 8–3–112(2) and 8–3–113(3). The arbitration requirement arises out of conditions imposed by the Urban Mass Transit Act of 1964 (UMTA), 49 U.S.C.App. §§ 1601–1621 (1988 & 1989 Supp.), to obtain federal funding. The UMTA made federal funds available for the conversion of private mass transit systems to public ownership. As a condition for the assistance, states were required to preserve the collective bargaining rights enjoyed by organized mass transit workers under private ownership. 49 U.S.C.App. § 1609(c) (1988). Therefore, when the General Assembly created RTD, it amended the Labor Peace Act to provide RTD employees with the benefits of mandatory collective bargaining and dispute resolution mechanisms. Act approved May 6, 1965, ch. 209, secs. 1–7, §§ 80–4–2 to –11, 1965 Colo.Sess. Laws 810–13; Act approved June 7, 1969, ch. 231, secs. 1–4, §§ 89–20–1 to –62, 80–4–2, 1969 Colo.Sess.Laws 714–31.

RTD, therefore, is very different from the city involved in *Holyoke* or the county that operated the local transit system at issue in *Durango*. The rationale of *Holyoke* and *Durango* does not apply to a governmental entity such as RTD that provides a single service so importantly affecting citizens of the state outside the entity's boundaries. The distinction between municipal functions, implicating the right to local self-government over local services, and functions affecting matters of concern to citizens beyond the boundaries of the government engaged in the functions cannot be made by application of any bright line rule. It involves line drawing based on matters of degree. RTD is not a municipality and is not performing a municipal function within the meaning of article V, section 35, of the Colorado Constitution by conducting negotiations with its employees' representative for a labor agreement governing the terms and conditions of their employment. The nondelegation requirement of article V, section 35, therefore, does not prevent the General Assembly from requiring the binding interest arbitration at issue in this case.

### B

■ RTD contends that the General Assembly's authorization of the Director to order arbitration and the Director's appointment of an arbitrator violate article XXI, section 4, of the Colorado Constitution. We disagree.

A statute may be declared unconstitutional only if there is no reasonable constitutional interpretation. Section 8–3–113(3) authorizes the Director to order arbitration when a strike would interfere with the preservation of the public peace, health, and safety, and section 8–3–112(2) requires the parties to submit to such arbitration. To comply with article XXI, section 4, of the Colorado Constitution, the Director must be politically accountable:

> Every person having authority to exercise or exercising any public or governmental duty, power or function, shall be an elective officer, or one *appointed,* drawn or designated in accordance with law by an elective officer or officers, or *by some* board, commission, *person* or persons *legally appointed by an elective officer* or officers, *each of which said elective officers shall be subject to the recall provision of this constitution....*

Colo. Const. art. XXI, § 4.

The arbitrator was appointed by the Director. The Director is appointed by the Executive Director of the Department of Labor, § 8–1–103(1), 3B C.R.S. (1986), who is appointed by the Governor, with the consent of the senate, and serves at the pleasure of the Governor, § 24–1–121(1), 10A

C.R.S. (1988). The Governor holds an elective office, § 1–4–204, 1B C.R.S. (1980), and is subject to recall under the Colorado Constitution, article XXI, section 4. Both the General Assembly's authorization of the Director to order arbitration, and the Director's appointment of the arbitrator, comply with the requirements of article XXI, section 4.

*Greeley Police Union v. City Council,* 191 Colo. 419, 553 P.2d 790 (1976), and *City of Aurora v. Aurora Firefighters' Protective Association,* 193 Colo. 437, 566 P.2d 1356 (1977), do not compel a different result. In *Greeley Police Union* we held an amendment to the Greeley City Charter providing for compulsory binding arbitration of all unresolved municipal-police union labor disputes to be unconstitutional on the ground that it constituted an unlawful delegation of legislative power.[7] 191 Colo. at 422, 553 P.2d at 791. In *Aurora Firefighters',* we followed *Greeley Police Union,* which we concluded was dispositive of whether the city of Aurora's submission to binding arbitration constitutes an unlawful delegation of legislative power. 193 Colo. at 440, 566 P.2d at 1357–58. Both cases can be distinguished from the present situation.

In *Greeley Police Union,* a private organization, in conjunction with the parties to the dispute, was delegated the power to appoint an arbitrator. 191 Colo. at 422, 553 P.2d at 791–92. The city charter in *Greeley Police Union* provided the following procedure for selecting the arbitrator:

> Following notification, the American Arbitration Association submits a list of five names to the parties. Each party may cross off two names from the list and then number the remaining names in order of preference. The Arbitration Association then selects a single person who is granted the authority to resolve all disputed issues.

*Greeley,* 191 Colo. at 422, 553 P.2d at 791. Similarly, the procedure utilized to select

the arbitrator in *Aurora Firefighters'* provided:

> In the event that there are unresolved issues, the American Arbitration Association is to be notified and it is to submit a list of seven proposed arbitrators. The city and the bargaining unit each shall cross off two of the names of the list, and the Association is to select the three arbitrators from the names remaining.

*City of Aurora v. Dilley,* 186 Colo. 222, 224, 526 P.2d 657, 658 (1974). Our concern in these cases was that the arbitrator was not politically accountable. We stated that a fundamental tenet of representative government is

> that officials engaged in governmental decision-making (*e.g.,* setting budgets, salaries, and other terms and conditions of public employment) must be accountable to the citizens they represent. Binding arbitration removes these decisions from the aegis of elected representatives, placing them in the hands of an outside person who has no accountability to the public.

*City of Greeley,* 191 Colo. at 422, 553 P.2d at 791–92 (citing *Dearborn Fire Fighters Union v. City of Dearborn,* 394 Mich. 229, 231 N.W.2d 226 (1975)); *see also Denver Firefighters,* 663 P.2d at 1037. Here, the selection of the arbitrator is by a politically accountable government official and complies with Article XXI, section 4. *See City of Detroit v. Detroit Police Officers,* 408 Mich. 410, 294 N.W.2d 68, 92–93 (1980).

C

■ RTD asserts that the statutes at issue here do not contain sufficient standards and procedural safeguards to protect against an abuse of discretion by the Director or the arbitrator. We disagree.

■ The test for determining whether a delegation of legislative power is too broad is "whether there are sufficient standards and safeguards and administrative standards and safeguards, in combination, to protect against unnecessary and uncon-

---

7. In *City & County of Denver v. Denver Firefighters Local No. 858,* 663 P.2d 1032 (Colo.1983), we limited our holding in *Greeley Police Union* to binding interest arbitration as opposed to grievance arbitration.

trolled exercise of discretionary power." *Cottrell v. City & County of Denver,* 636 P.2d 703, 709 (Colo.1981); *see also State Farm v. City of Lakewood,* 788 P.2d 808, 815 (Colo.1990).

▪ The Labor Peace Act provides that under circumstances that would interfere with the public peace, health, and safety, the Director may deny the right to strike, but balances the denial with the provision for mandatory arbitration. § 8–3–113(3); *see People v. United Mine Workers,* 70 Colo. 269, 201 P. 54 (1921). Section 8–3–112(2) provides for judicial review of the Director's order to arbitrate. The reviewing court may overturn the arbitrator's award if it finds the arbitrator "has been unfair, capricious, or unjust in its conduct, determinations, or award." Since the arbitrator's discretion to set terms and conditions of employment is limited by sufficient standards of judicial review, the provisions for an arbitrator do not constitute too broad a delegation of legislative authority.

### III

We conclude that sections 8–3–112(2) and 8–3–113(3) are not unconstitutional under article V, section 35, or article XXI, section 4, of the Colorado Constitution and do not unconstitutionally delegate legislative authority. Accordingly, we reverse the summary judgment entered by the district court for RTD and remand to the district court for further proceedings consistent with this opinion.

VOLLACK, J., dissents and ROVIRA, C.J., joins in the dissent.

QUINN, J., does not participate.

Justice VOLLACK dissenting:

The majority concludes that sections 8–3–112(2) and 8–3–113(3), 3B C.R.S. (1986), are constitutional under Colorado Constitution article V, section 35, and do not unconstitutionally delegate legislative authority because the Regional Transportation District (RTD) is not a municipality. Maj. op. at 949. I disagree. In *City of Durango v. Durango Transportation, Inc.,* 807 P.2d 1152 (Colo.1991), this court adopted the

"function approach" to determine whether a governmental entity is a municipality under article V, section 35. Under the function approach, RTD is clearly within the meaning of "municipal" in article V, section 35, and thus, the provisions of sections 8–3–112(2) and 8–3–113(3) granting the Director of Labor authority to order RTD to submit to binding arbitration constitute an unconstitutional delegation of authority under article V, section 35.

### I.

RTD and the Amalgamated Transit Union (ATU) were parties to a collective bargaining agreement. This agreement expired on February 28, 1991. On December 4, 1990, pursuant to section 8–3–113(3), ATU filed a notice of intent to strike if the agreement was not renegotiated by the expiration date.

Section 8–3–113(3) provides that the Director of the Division of Labor (the Director) must enter an order allowing or denying the strike within twenty days of the filing of the notice. The Director will deny the strike if such "strike would interfere with the preservation of the public peace, health, and safety." § 8–3–113(3). Any order denying the strike must include an order to arbitrate. Pursuant to section 8–3–112(2), the arbitration results are binding upon the parties.

On August 20, 1991, the Director denied the strike request, concluding that a strike would interfere with the preservation of the public peace, health, and safety, and ordered the parties to submit their dispute to binding arbitration. On August 26, 1991, RTD filed a complaint and petition for judicial review, contending that the provisions of sections 8–3–112(2) and 8–3–113(3) requiring binding arbitration constituted an unlawful delegation of legislative authority. On October 28, 1991, the district court concluded that the arbitration order was unconstitutional and granted summary judgment in favor of RTD.

### II.

RTD was created to "promote the public health, safety, convenience, economy, and

welfare of the residents of the district and the state of Colorado." § 32–9–102(1)(a), 13 C.R.S. (1973). RTD "is authorized to develop, maintain, and operate a mass transportation system for the benefit of the inhabitants of the district." § 32–9–107, 13 C.R.S. (1991 Supp.).

RTD has been given "the duties, privileges, immunities, rights, liabilities, and disabilities of a public body politic and corporate." § 32–9–119(1)(a), 13 C.R.S. (1973). RTD is a political subdivision of the state. § 32–9–119(1)(a). It possesses "all rights and powers necessary or incidental to or implied from the specific powers granted in [the Regional Transportation District Act], which specific powers shall not be considered as a limitation upon any power necessary or appropriate to carry out the purposes and intent of th[e Act]." § 32–9–119(1)(x), 13 C.R.S. (1973). RTD may sue and be sued and has been given the power of eminent domain. §§ 32–9–160, –161, 13 C.R.S. (1973). *See also* § 32–9–119, 13 C.R.S. (1973 & 1991 Supp.) (listing additional RTD powers).

RTD is governed by a board of directors. The board consists of fifteen members, each of whom represents a director district. A director district is the "area within the district which is represented by one director." § 32–9–103(3.5), 13 C.R.S. (1991 Supp.). The director districts are reapportioned after each census on the basis of population and are "comprised of general election precincts established by the boards of county commissioners of those counties, all or part of which are within the district, and by the election commission of the City and County of Denver." § 32–9–111(2), 13 C.R.S. (1991 Supp.). "No general election precinct may be split into one or more director districts." *Id.*

Board members are elected by registered electors residing in the board member's director district. § 32–9–111(3), 13 C.R.S. (1991 Supp.). Board members are elected to four-year terms in district elections "held concurrently with the state general election in every even-numbered year." § 32–9–111(3), (4), 13 C.R.S. (1991 Supp.).

Any board member "may be recalled from office by the electors of the director district such member represents." § 32–9–112(2), 13 C.R.S. (1991 Supp.). Each member receives three thousand dollars per year and is reimbursed for expenses. § 32–9–117, 13 C.R.S. (1991 Supp.).

### III.

Our decision in *City of Durango v. Durango Transportation, Inc.*, 807 P.2d 1152 (Colo.1991), is dispositive of the question of whether RTD is within the meaning of "municipal" in article V, section 35. The City of Durango and the County of LaPlata entered into an agreement to provide a mass transit system in the County. The agreement provided for the operation and maintenance of the transit system by the city. The city would establish fares with advice from the Transit Advisory Board, which was made up of both city and county appointees.

Durango Transportation, Inc., a private corporation, had a Public Utilities Commission (PUC) certificate to provide a mass transit system in the county, including the routes covered by the agreement between the city and county. Durango Transportation, Inc., filed suit against the city and county to prevent the city and county's operation of the county mass transit system without authorization by the PUC.

In *Durango*, we reviewed whether Colorado Constitution article V, section 35, prohibited the PUC's regulation of the county transit system. Article V, section 35, provides:

> **Delegation of Power.** The general assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any *municipal* improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any *municipal* function whatever.[1]

(Emphasis added.)

In determining whether article V, section 35, applied to the county, we had to determine

---

1. The arbitrator is a "special commission, private corporation or association" within the

mine whether the county was within the meaning of "municipal" in article V, section 35. After recognizing that the Colorado Constitution does not define "municipal," this court exhaustively reviewed the definition and interpretation of "municipal" in other jurisdictions. We concluded that

> in modern usage the scope of the term "municipal" is to be determined by reference to the particular *function* to be performed rather than by strict adherence to the classification of the governmental entity performing that function as a city, county, *or other unit of government.*

*Durango*, 807 P.2d at 1156 (emphasis added). We further stated that the

> functional approach to defining "municipal" is particularly compelling in light of our interpretation of article V, section 35. We observed in *Holyoke [v. Smith*, 75 Colo. 286, 226 P. 158 (1924),] that article V, section 35, protects the historical right to local self-government. We noted that "[t]he *subjects* to which this protection extends [e.g., improvements and property] ... are such as properly fall within the domain of local self-government."

*Id.* at 1157 (citation omitted).

Thus, we recognized that customers must have recourse through the political process, in order to find that a governmental entity in providing a local service is within the meaning of "municipal" in article V, section 35. *Id.* at 1157–58. We concluded that county residents have the power to effect change in the governing board responsible for the service provided by the county-owned mass transit system. Specifically, this court found that

> [u]nder Colorado law, "[t]he powers of a county as a body politic and corporate shall be exercised by a board of county commissioners therefor." § 30–11–103, 12A C.R.S. (1986). Commissioners are elected from districts "by voters of the whole county." § 30–10–306(1), 12A C.R.S. (1986). In addition, "[e]very

elective county officer of the state of Colorado may be recalled from office at any time by the registered electors of the county." § 30–10–201, 12A C.R.S. (1986).

*Id.* at 1157.

We held that the "term 'municipal' in article V, section 35, applies to counties when engaged in providing mass transit within county boundaries." *Id.* at 1158. We explained our holding, however, by stating:

> A county acting to provide local services commonly considered to be "municipal functions" is acting in a capacity distinct from its function as an administrative arm of state government. *It is for the purpose of providing local services alone* that we hold that a county falls within the meaning of "municipal" in article V, section 35.

*Id.* at 1158 n. 6 (emphasis added). This explanation clearly establishes that the focus is on the function being performed— providing a mass transit system—and not on whether the governmental entity is a city, town or county.

### IV.

#### A.

The majority recognizes that the functional approach in *Durango* applies to this case. However, the majority abandons the approach we adopted in *Durango* by stating that RTD is not a "multiple purpose governmental entity ... providing general local government services." Maj. op. at 946. The purpose of the functional approach is not to determine the number of functions RTD provides but whether the function RTD provides is a local service commonly considered a municipal function. Mass transit is a local service which constitutes a municipal function. *Durango*, 807 P.2d at 1158, 1158 n. 6.

Moreover, in *Durango* we recognized two different and distinct approaches to construing "municipality." *Durango*, 807

---

meaning of article V, section 35. *See Greeley Police Union v. City Council*, 191 Colo. 419, 553 P.2d 790 (1976); *Munson v. City of Colorado Springs*, 35 Colo. 506, 510, 84 P. 683 (1906)

(concluding that article V, section 35, applies to "a private person or corporation or a purely voluntary private association").

P.2d at 1156. The term "municipality" can be construed in the historical, narrow sense "to mean only cities, towns and villages," or it can be construed in the modern, broader sense "to mean any political subdivision of the state with a public purpose and a governmental function." *Durango,* 807 P.2d at 1156. We adopted the modern approach in *Durango,* which the majority tacitly rejects. Instead, the majority now adopts a test which combines these two approaches and represents a retreat from the modern approach this court unanimously adopted in *Durango.* This new approach narrows the scope of what can be considered a municipality only to those entities which are "multiple purpose governmental entities."

The majority also states that there is a "distinction between municipal functions, implicating the right to local self-government over local services, and functions affecting matters of concern to citizens beyond the boundaries of the government engaged in the functions." Maj. op. at 947. Apparently, the majority places "municipalities" in the first group and RTD in the second group. The statute, by its plain terms, indicates that RTD is more appropriately described as "implicating the right to local self-government over local services." The statute gives the citizens of the district, like the citizens of a county or city, the right to self-government over the mass transportation system provided by RTD. Like the county in *Durango,* RTD is a body politic and corporate whose powers are exercised by its board of directors. The people of the district have the power to elect and the power to recall board members. RTD's board of directors is responsible *only* to the voters in the district. Clearly, RTD is a local unit of self-government that gives the people in the district the power to govern themselves locally concerning mass transit.[2]

Application of the functional approach and the interpretation of article V, section 35, adopted in *Durango* to the present case

leads to the conclusion that RTD is within the meaning of "municipal" in article V, section 35. RTD provides a local service commonly considered a municipal function. RTD is a body politic and corporate which has the powers of a municipal corporation. *See* Eugene McQuillin, *Municipal Corporations* § 2.07a (3d ed. 1987) (a municipal corporation is a body politic and corporate, possessing various enumerated powers). The people in the district have recourse through the political process to effect a change if they are not satisfied with the RTD board's actions.

### B.

In order to distinguish the present case from *Durango,* the majority states that the "RTD mass transit system involves economic and social issues of concern to the entire state as well as to the citizens within the boundaries of the area served by RTD." The majority does not indicate what economic or social issues "transcend" the RTD boundaries. Instead, they contend that this fact is evidenced by the "special legislation" by which RTD came into being.

The RTD legislation was enacted to benefit the Denver metropolitan area. The legislation's enactment made available to RTD benefits under the Urban Mass Transportation Act of 1964 (the UMTA), 49 U.S.C.app. §§ 1601 to 1621 (1988). This Act recognized "that the predominant part of the Nation's population is located in its rapidly expanding metropolitan and other urban areas," and one of the Act's purposes was "to *encourage the planning and establishing of areawide urban mass transportation systems* needed for economical and desirable urban development." 49 U.S.C. § 1601(a)(1), (b)(2) (emphasis added). The principal encouragement for developing areawide urban mass transportation was monetary. Urbanized areas with populations of 200,000 or more were to be allocated 88.43 percent of available federal funds.

---

**2.** Furthermore, it is difficult to see how RTD's providing a local bus service to the Denver metropolitan area affects the citizens of the state outside the district's boundaries any more

than the local police in Grand Junction or some other city, which is a municipal function, affects the citizens of the state.

Of that amount, the majority of funds were available to urbanized areas of 1,000,000 or more.

Thus, even the RTD legislation's enactment was intended to benefit only the Denver metropolitan area. As stated above, the UMTA was enacted to promote area-wide urban mass transportation. By forming the RTD, the General Assembly fulfilled the purpose of the UMTA and put *the Denver metropolitan area* in a position to collect a larger share of federal funds for its "areawide" transportation system.

The majority also contends that the "fact that the functioning of RTD is a matter of statewide concern is also evidenced by the source of the arbitration requirement contained in sections 8–3–112(2) and 8–3–113(3)." Maj. op. at 947. The majority states that as a condition for assistance under the UMTA, "states were required to preserve the collective bargaining rights enjoyed by organized mass transit workers under private ownership." Maj. op. at 947. The majority concludes: "Therefore, when the General Assembly created RTD, it amended the Labor Peace Act to provide RTD employees with the benefits of mandatory collective bargaining and dispute resolution mechanisms." Maj. op. at 947.

The majority's reasoning is not supported by either the provisions of the UMTA or the Labor Peace Act. First, the Labor Peace Act was amended four years before the RTD was created. Thus, the General Assembly did not amend the Labor Peace Act when it created RTD.

Second, the UMTA required as a "condition of any assistance under section 1602 of this title that fair and equitable arrangements are made" to ensure the "continuation of collective bargaining rights." 49 U.S.C.app. § 1609(c). Colorado's Labor Peace Act exempts the "state and any political subdivisions thereof" from its provisions. § 8–3–104(12), 3B C.R.S. (1986). Because many political subdivisions would be operating mass transit systems, the General Assembly created an exception to the Labor Peace Act, section 8–3–104(12), which would satisfy the "fair and equitable arrangements" requirement of the UMTA and allow the various political subdivisions to qualify for assistance under the UMTA. The Labor Peace Act was not amended to specifically benefit RTD employees. It was amended to benefit *all* political subdivisions of the state that provided mass transit.

## V.

I dissent from part II.A. of the majority's opinion and would affirm the district court's decision finding that the binding arbitration is an unconstitutional delegation of authority under article V, section 35.[3] Because I would find that the binding arbitration is an unconstitutional delegation of authority under article V, section 35, I would not address the constitutionality of sections 8–3–112(2) and 8–3–113(3) under Colorado Constitution article XXI, section 4.

I am authorized to say that Chief Justice ROVIRA joins in this dissent.

**3.** A conclusion that §§ 8–3–112 and 8–3–113 constitute an unconstitutional delegation of power does not violate 49 U.S.C.app. § 1609(c) (1988) of the Urban Mass Transit Act. Section 1609(c) provides that, as a condition of assistance from the federal government, "fair and equitable arrangements" must be made to protect the interests of employees. This section mandates collective bargaining but does not require binding arbitration. *Amalgamated Transit Union Int'l v. Donovan,* 767 F.2d 939, 955 (D.C.Cir.1985). In this case, good-faith bargaining between RTD and ATU is assured because § 8–3–113(1) requires mediation and because the employees still retain the right to strike. RTD recognizes ATU's right to strike in its brief where it states that "a strike by the Union would not interfere with the preservation of the public peace, health and safety, and that the Union should be permitted to go on strike if the parties are unable to resolve issues through the collective bargaining process."